**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| OLHA NOHA, | ) | |
| Plaintiff, | ) | Civil Action No. 25-cv-01308 (RBW) |
| v. | ) | |
| CARLA HAYDEN, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the Court on the Motion to Dismiss ("MTD"), ECF No. 25, filed by the defendant, the Librarian of Congress. For the reasons stated below, the Court grants the defendant's Motion and dismisses this matter.

## I. BACKGROUND

The following allegations are alleged by the plaintiff. She contends that, on March 1, 2025, she went to the Library of Congress ("the Library") to work on a project and study. *See* Complaint ("Compl."), ECF No. 1, at 4, 6, 8. While there, a woman approached the plaintiff, *see id.* at 6, who did not personally identify herself, nor did she have any sort of identification or employee badge, but she held herself out as the Library manager, *see id*. at 6–7. She began talking to the plaintiff about another occasion, approximately a month earlier, when the plaintiff visited the Library and brought a cup of coffee with her, which is not allowed. *See id.* at 4, 6. But, on this second occasion, the plaintiff did not have a beverage. *See id*. at 6. The plaintiff expressed her confusion to the manager, and after some escalating back and forth, the manager stated that the plaintiff could not work in the Library, and noted that the Library "only [has] books in English,"

and none in the plaintiff's language. *See id*. The plaintiff ultimately told the manager that their "dialogue was over[,]" thus concluding the interaction. *See id*. at 7.

About an hour later, the plaintiff was watching the news on a Library computer, and another Library employee approached her and told her that she could not watch the video with audio activation, and the plaintiff complied, turning off the sound. Then, around 4 p.m., the "manager" with whom she had the prior encounter, again approached the plaintiff and informed her that she was preventing the staff from closing the Library early. The plaintiff, who by that time had reached a "boiling point," protested and told the manager that such treatment was "absurd and [constituted] discrimination." *See id*. In response, the manager again stated that there were no books available in the plaintiff's language and urged her to leave. *See id*. at 7–8. Security personnel eventually intervened at the plaintiff's request, and the plaintiff attempted to file a complaint against the manager with security for "moral discrimination," but the manager never identified herself, and based on the circumstances, the plaintiff surmised that "she was not [actually] an employee of this Library." *See id*. at 8. At that point the plaintiff decided to leave, but before doing so, she declared that she would file a lawsuit for "nationality persecution" and "obstruction of access" to the Library, and warned that she could "provoke a diplomatic scandal." *See id*. at 9.

Two days later, on March 3, 2025, the plaintiff returned to the Library. She performed work for about two hours, after which security guards approached her and informed her that she was banned from the premises. The guards then confiscated her Library card and escorted her outside without further explanation. Additionally, she was provided with a formal barring notice. *See id*.; *see also id*. at 11 (Barring Notice, Mar. 3, 2025) ("Barring Notice"). The plaintiff attributes her Library ban to "open discrimination and racism." *See id.* at 10.

The plaintiff attached to her Complaint a copy of the barring notice, dated March 3, 2025, and issued by the Library's Director of Security and Emergency Preparedness, which states that the plaintiff is "permanently denied access to the Library of Congress and its buildings and grounds" because of her actions on March 1, 2025. *See* Barring Notice. More specifically, the Barring Notice stated that the plaintiff's "disruptive and threatening behavior [which] . . . disturbed the peace and tranquility of the Library[,]" including allegedly threatening "the reading room staff with bodily harm when they directed [her] to correct [her] disruptive behavior." *See id*.

The plaintiff, proceeding *pro se*, then filed the Complaint in matter on April 29, 2025. [1] *See generally* Compl. She demands that the Court restore her access to the Library and that the Library reevaluate the legitimacy of its employees. *See id*. at 10. In response to the Complaint, on January 12, 2026, the defendant filed the pending Motion to Dismiss. *See generally* MTD. The defendant attests that the plaintiff was served with the Motion by certified mail and by email. *See* Certificate of Service (Jan. 12, 2026), ECF No. 26.

On January 14, 2026, the Court issued an Order ("*Fox* Order"), ECF No. 27, advising the plaintiff of her obligation to respond to the Motion to Dismiss, forewarning her of the consequences of failing to respond, and directing her to file a response by no later than February 17, 2026, *see id*. at 1–2 (citing *Fox v. Strickland*, 837 F.2d 507, 509 (D.C. Cir. 1988) (per curiam)). On January 23, 2026, the Clerk of Court mailed a copy of that Order to the plaintiff's address of

---

[1] After filing this case, the plaintiff filed an influx of notices ostensibly attempting to supplement her Complaint, *see, e.g.*, Notices, ECF Nos. 7–9, 12, but a notice is not a proper mechanism for amending or supplementing a complaint. Instead, a complaint is amended in accordance with Rule 15(a) and (d) of the Federal Rules of Civil Procedure and with Local Rule 7(i) and 15.1 of this court. *See Lewis v. Sessions*, No. 17-5475 (FLW), 2017 WL 7313822, at *6 (D.N.J. Nov. 3, 2017) ("Neither Fed. R. Civ. P. 8, which governs pleadings, nor Fed. R. Civ. P. 15, which governs amended and supplemental pleadings, permits [a plaintiff] to submit numerous addenda to his Complaint in this piecemeal fashion.").

record. That deadline elapsed with no submission from the plaintiff. Then, on April 28, 2026, the copy of the *Fox* Order sent to the plaintiff was returned to the Clerk of Court as undeliverable at her address of record, and it was then resent to an alternative address. *See* Mail Returned as Undeliverable, ECF No. 28. Notwithstanding this second attempt, the *Fox* Order was again returned as undeliverable to the plaintiff on July 9, 2026. *See* Mail Returned as Undeliverable, ECF No. 29. To date, the plaintiff has not updated her address of record, in contravention of this Court's Local Civil Rule 5.1(c)(1), nor has she responded the defendant's Motion to Dismiss. Indeed, the plaintiff has not participated in this case whatsoever for over ten months. *See* Request for Leave to File proposed "Motion for Judges to Follow the Law" (Sept. 9, 2025) (representing the last action taken in this case by the plaintiff), ECF No. 19.

## II. LEGAL STANDARDS

### A. Subject Matter Jurisdiction

"Article III of the Constitution prescribes that '[f]ederal courts are courts of limited subject-matter jurisdiction' and 'ha[ve] the power to decide only those cases over which Congress grants jurisdiction.'" *Bronner v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (alterations in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)); *see Gunn v. Minton,* 568 U.S. 251, 256 (2013) ("'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'") (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Absent subject-matter jurisdiction over a case, a court must dismiss it. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.")).

To survive a motion to dismiss under Federal Rule 12(b)(1), the plaintiff bears the burden of demonstrating a court's subject-matter jurisdiction over the claims at issue. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015), *cert. denied*, 577 U.S. 1103 (2016). When considering a motion to dismiss under Rule 12(b)(1), a court must accept as true all uncontroverted material factual allegations contained in the complaint and "'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged' and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005); *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004)). A court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

When reviewing a challenge pursuant to Rule 12(b)(1), a court may consider documents outside of the pleadings to assure itself that it has jurisdiction. *See Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). By considering documents outside the pleadings when reviewing a motion to dismiss pursuant to Rule 12(b)(1), a court does not convert the motion into one for summary judgment; "the plain language of Rule 12(b) permits only a 12(b)(6) motion to be converted into a motion for summary judgment" when documents extraneous to the pleadings are considered by a court. *Haase*, 835 F.2d at 905.

Relevant here, the United States and its officials, agencies, and instrumentalities, are all absolutely immune from suit for damages unless that immunity is waived expressly. *See Kokkonen*, 511 U.S. at 377; *U.S. v. Mitchell*, 445 U.S. 535, 538 (1980). It is the plaintiff's burden to establish the existence of such a waiver, *see Kokkonen*, 511 U.S. at 377, and the absence of a

waiver of sovereign immunity precludes the Court from having subject matter jurisdiction, *see FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

**B. <u>Failure to State a Claim</u>**

A plaintiff is obligated to provide a short and plain statement of her claim showing that she is entitled to relief, Fed. R. Civ. P. 8(a)(2), and that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The court "must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (per curiam) (citation omitted), *cert. denied*, 568 U.S. 1088 (2013); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (same). However, "the court need not accept inferences drawn by plaintiff[] if such inferences are unsupported by the facts set out in the complaint." *Id.* Nor must the court accept "a legal conclusion couched as a factual allegation," or "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to state a claim. *Id*. Although a *pro se* complaint "must be held to less stringent standards than formal pleadings drafted by lawyers," *Erickson*, 551 U.S. at 94 (internal quotation marks and citation omitted), it still "must plead 'factual matter' that permits the court to infer 'more than the mere possibility of [the

defendant's] misconduct,'" *Atherton v. Dist. of Columbia Office of the Mayor*, 567 F.3d 672, 681–82 (D.C. Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678–79), *cert. denied*, 559 U.S. 1039 (2010).

In ruling on a motion to dismiss for failure to state a claim, a court may consider the facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which a court may take judicial notice, and matters of public record. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## III. DISCUSSION

The plaintiff does not cite to any legal authority in her Complaint, nor does she set forth any specific claims in the Complaint, largely contravening Federal Rules 8(a) and 10(b) ("A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances."). *See, e.g., Klayman v. Obama*, 125 F. Supp. 3d 67, 89 (D.D.C. 2015) (dismissing claims pursuant to Federal Rule 12(b)(6) where the plaintiffs made "no effort to explain what rights . . . [were] at issue, leaving the Federal Defendants (and the court) to guess what cause of action Plaintiffs intend[ed] to present[.]") (citation and internal quotation marks omitted). However, generously construing the plaintiff's allegations, it is conceivable that she seeks to challenge a determination under the Administrative Procedure Act ("APA"), or to redress civil rights violations protected by the United States Constitution. *See* MTD at 6–9 (construing in the substantially same manner). The Court addresses those putative claims *seriatim*.

### A. APA Claim

The plaintiff challenges the Library's decision to bar her from the Library, and under the APA, a court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). The APA, however, only waives the sovereign immunity of the United

States for claims "in a court of the United States seeking relief other than money damages," when those claims are made against "an agency or an officer or employee thereof." *Id.* at § 702. The APA defines an "agency" as "each authority of the Government of the United States, but does not include the Congress." *Id*. § 701(b)(1)(A) (cleaned up); *see also id*. § 702 (limiting judicial review to "agency action"). The Library is part of the legislative branch, and therefore, it is also protected from the waiver of sovereign immunity reserved for Congress by § 701(b)(1)(A). *See Ethnic Empls. of Lib. of Cong. v. Boorstin*, 751 F.2d 1405, 1416 n.15 (D.C. Cir. 1985) (concluding that the Library of Congress is not an agency under the APA based on the definition of an agency in 5 U.S.C. § 551(1)); *Wash. Legal Foundation v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994) ("[W]e have held that the Library of Congress . . . is exempt from the APA because its provisions do not apply to 'the Congress'—that is, the legislative branch."); *Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984) (finding that the plaintiff could "not take advantage of this broad waiver of sovereign immunity since the Library of Congress is not an 'agency' as defined under the Administrative Procedure Act.") (citing 5 U.S.C. § 701(b)(1)(A)); *see also Green v. Dep't of Just*., 392 F. Supp. 3d 68, 99 (D.D.C. 2019) ("[P]laintiffs have pointed to nothing in the text of the APA, its legislative history, or legal precedent that suggests that Congress did not intend to include the Library of Congress when engaging in Executive Branch functions in 'the Congress' that it exempted from the APA's definition of 'agency.'"), *aff'd*, 111 F.4th 81 (D.C. Cir. 2024); *Abrams v. Hayden*, No. 18-1338 (RBW), 2018 WL 8754180, at *3 (D.D.C. Aug. 7, 2018) (dismissing claims pursuant to Federal Rule 12(h)(3) because the decisions of the Librarian of the Library of Congress "are not reviewable under the Administrative Procedure Act, as that statute only permits judicial review of agency action, . . ."and the Library [of Congress] is not an agency

under the Administrative Procedure Act[.]") (citations and internal quotation marks omitted), *aff'd*, 752 Fed. Appx. 1 (D.C. Cir. 2019) (per curiam).

However, a limited exception to the applicability of sovereign immunity exists in lawsuits brought against a government officer sued in her official capacity, namely, ultra vires liability. The ultra vires exception is "based on the principle that . . . [an] action by a federal officer is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Pollack v. Hogan*, 703 F.3d 117, 119-20 (D.C. Cir. 2012) (per curiam) (citation and internal quotation marks omitted). It affords review of an agency action when an agency has violated an unambiguous and mandatory legal requirement. *Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958); *see Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) (a court may recognize an ultra vires claim when an agency patently misconstrues a statute, disregards a specific and unambiguous statutory directive, or violates a specific command of a statute) (citing cases). "Time and again, courts have stressed that ultra vires review has 'extremely limited scope[,]'" *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (quoting *Griffith*, 842 F.2d at 493), and its application is rare "because ultra vires review seeks the intervention of an equity court where Congress has not authorized statutory judicial review, on the assumption that Congress has not 'barred judicial comparison of agency action with plain statutory commands[.]'" *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (quoting *Dart v. United States*, 848 F.2d 217, 222 (D.C. Cir. 1988)). Put differently, an ultra vires claim is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Changji*, 40 F.4th at 722.

Here, the plaintiff broadly insinuates that the defendant's actions were an abuse of authority, but she never explains specifically why or how so. And, to the contrary, the defendant has shown its decision to prohibit an individual from the Library is specifically committed to

agency discretion by law, so that the Library and its staff may properly manage and protect its employees and those who use the Library. *See* MTD at 8–10. In furtherance of this objective, the Library has promulgated rules governing the conduct of all visitors. *See* 36 C.F.R. § 702.2. The regulations require visitors to, *inter alia*, conduct themselves "in such a manner as not to affect detrimentally the peace, tranquility, and good order of the Library," *id.* § 702.2(a), and expressly authorize the Library, upon written notice by the Director of Security, to, as here, deny access to an individual who fails to comply with the code of conduct and to prohibit further use of Library facilities, *see id.* § 702.14(b). That decision is then subject to reconsideration pending written request to the Director of Security, *see id*. § 702.14(b)(1), and there is no indication that the plaintiff availed herself to that process. Accordingly, contrary to the plaintiff's broad insinuations, the barring order was issued well within the Library's designated statutory authority.

Because the plaintiff has failed to allege, let alone show, that the alleged actions were ultra vires, she has in two respects failed to establish that there has been any waiver of the defendant's sovereign immunity, and her putative APA claim is therefore dismissed.

### B. <u>Constitutional Claims</u>

The plaintiff contends that she has been unfairly denied access to the Library. Courts have generally held that access to a public library is a protected right under the First Amendment, but that right is not absolute and is subject to limitations, including those necessary to prevent disruptive behavior. *See*, *e.g.*, *Armstrong v. Dist. of Columbia Pub. Library*, 154 F. Supp. 2d 67, 75 (D.D.C. 2001) (collecting cases); *Grant-Davis v. Bd. of Trustees of Charleston County Pub. Libr*., No. 15-cv-2676 (PMD-MGB), 2017 WL 9360875, at *19–24 (D.S.C. May 24, 2017), *R&R adopted*, 2017 WL 3634070 (D.S.C. Aug. 24, 2017), *aff'd*, 710 Fed. Appx. 134 (4th Cir. 2018) (per curiam); *Nappi v. Timberline Reg. Libr.*, No. C14–5945 (JRC), 2015 WL 3936308, at *3

(W.D. Wash. June 26, 2015); *Doyle v. Clark County Pub. Library*, No. C-3-07-0003 (TMR), 2007 WL 2407051, at *4–5 (S.D. Ohio Aug. 20, 2007); *Miller v. NW Region Libr. Bd.*, 348 F. Supp. 2d 563, 570 (M.D.N.C. 2004) (citing *Kreimer v. Bureau of Police for the Town of Morristown*, 958 F.2d 1242, 1242 (3rd Cir. 1992); *Neinast v. Bd. of Trustees of the Columbus Metro. Library*, 346 F.3d 585, 591 (6th Cir. 2003); *Armstrong*, 154 F. Supp. 2d at 75); *Wayfield v. Town of Tisbury*, 925 F. Supp. 880, 888 (D. Mass. 1996).

Furthermore, and notably, the First Amendment does not guarantee public access to property owned or controlled by the federal government. *U.S. Postal Service v. Greenburgh Civic Ass'n*, 453 U.S. 114, 130 (1981) (citing cases). "The Government 'no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated.'" *U.S. v. Grace*, 461 U.S. 171, 178 (1983) (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)). This principle applies in equal measure to the Library of Congress. *See AFSCME Local 2477 v. Billington*, 740 F. Supp. 1, 7 (D.D.C. 1990); *see also Bell-Boston v. Library of Congress*, No. 13–1930 (CKK), 2013 WL 6639623, at *1 (D.D.C. Dec. 5, 2013) (finding that "[a]ccess to a federal building is not absolute[,]" and dismissing the plaintiff's claims where she alleged that she was wrongfully prohibited from use of "reading rooms at the Library of Congress in order to use its resources for her job search."). Although "the Library's reading rooms, cafeteria, and other common areas are open to the public," it is not a "public library" in the tradition sense; it is, among other things, the main research arm for Congress, and it also "houses invaluable property." *See AFSCME Local*, 740 F. Supp. at 7. So, while the Library is, in some measure, available to the public, "[t]he rooms of the Library of Congress are not a *public forum* . . . [and] [t]he law is clear that the federal government may restrict access to public property that is not a public forum." *Id*. (emphasis added); *see Brosten v. Library of Congress*, No. 14–449 (ESH), 2014

WL 1386814, at *1 (D.D.C. Mar. 20, 2014) (dismissing for failure to state a claim and for want of subject matter jurisdiction where the plaintiff sued "the Library of Congress for allegedly limiting his access presumably to the building.").

The plaintiff alleges, however, that she was not only banned, but that she was banned unlawfully due to "nationality persecution." *See* Compl. at 9. She does not suggest a specific legal theory in support of her position, but construing the Complaint liberally, arguably this may be an allegation that her equal protection rights were violated. Although the mandate against denying any person "equal protection of the laws" appears in the text of the Fourteenth Amendment, it also applies to the federal government, as incorporated into the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 500 (1954). But, constitutional equal protection "does not require that all persons everywhere be treated alike. Instead, it imposes the rather more modest requirement that government not treat similarly situated individuals differently without a rational basis." *Noble v. U.S. Parole Comm'n*, 194 F.3d 152, 154 (D.C. Cir. 1999) (per curiam) (citing *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). And "[d]issimilar treatment of dissimilarly situated persons, does not violate equal protection." *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996) (citation and internal quotation marks omitted), *cert. denied*, 520 U.S. 1196 (1997)

Where, as here, a plaintiff arguably claims that she was discriminated against in violation of the Fifth Amendment, "the plaintiff must plead . . . that the defendant acted with discriminatory purpose." *Iqbal*, 556 U.S. at 676. Purposeful discrimination requires "a decisionmaker's undertaking a course of action because of, not merely in spite of, [the action's] adverse effects upon an identifiable group." *Id*. at 676–77 (alterations in original) (citation and internal quotation marks omitted). That requires more than a bare attribution—namely either "circumstantial or direct

evidence of intent[,]" *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977))[,] which means that the evidence must plausibly imply "more than intent as volition or intent as awareness of consequences[,]" *Iqbal*, 556 U.S. at 676.

Here, the Complaint's conclusory allegations fall short of stating a viable Equal Protection claim. First, to state an equal protection claim based on circumstantial evidence of discriminatory intent, the plaintiff must allege that she "was treated differently than similarly situated individuals" and that the defendant's "explanation does not satisfy the relevant level of scrutiny." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1102-03 (D.C. Cir. 2005) (citation omitted). "The first requirement—that there be another party that is similarly situated to the plaintiff—'is not a mere formality[; r]ather, it serves to distinguish claims to [obtain] the treatment that was afforded others, which can be cognizable under principles of equal protection, from bare complaints of governmental unfairness, which cannot.'" *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 75 (D.D.C. 2015) (alterations in original) (quoting *Quezada v. Marshall*, 915 F. Supp. 2d 129, 135 (D.D.C. 2013)). And here, the plaintiff has not identified *any* other individuals (or groups), let alone those similarly situated, nor has she pleaded that anyone else received more favorable treatment. Without any such allegations, she has missed the mark in stating an Equal Protection violation claim. *See Mpras v. Dist. of Columbia*, 74 F. Supp. 3d 265, 271–72 (D.D.C. 2014) (dismissing plaintiff's equal protection claim based on the plaintiff's failure to "allege any facts . . . about who these other persons are or how they were similarly situated"); *Hardaway v. Dist. of Columbia*, No. 14–1273 (RJL), 2015 WL 5138711, at *3 (D.D.C. Aug. 31, 2015) (same), *aff'd*, No. 15–7095, 2016 WL 232009 (D.C. Cir. Jan. 4, 2016) (per curiam).

Insofar as the plaintiff alleges that her interactions with Library personnel reflect direct evidence of discriminatory intent, her allegations have also fallen short. The only conceivable

examples of discriminatory animus identified in the Complaint are, perhaps, the manager's alleged comments that the Library does not maintain books in the plaintiff's language. But "[l]anguage, by itself, does not identify members of a suspect class[,]" *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2nd Cir. 1983) (citing *Frontera v. Sindell*, 522 F.2d 1215, 1219–20 (6th Cir.1975); *Carmona v. Sheffield*, 475 F.2d 738, 739 (9th Cir. 1983)), *cert. denied*, 466 U.S. 929 (1984); *see also Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir. 1980) (rejecting attempts to find discrimination based on "language" because it correlated with "national origin"), *cert. denied*, 449 U.S. 1113 (1981), and discrimination based on language "is not *per se* unlawful[,]" *see Cota v. Tucson Police Dept.*, 783 F. Supp. 458, 460 n.2 (D. Ariz. 1992).

Although language can, at times, serve as a "close and meaningful proxy for national origin," *Yniguez v. Arizonans for Official English*, 69 F.3d 920, 947–48 (9th Cir. 1995), *vacated on other grounds*, 520 U.S. 43 (1997), and may manifest as covert pretext for national origin discrimination, *see Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007) (quoting *Garcia*, 618 F.2d at 268), the challenged language should be "immutable," so that it "can be identified as an essential characteristic of a particular national group[,]" *Smothers v. Benitez*, 806 F. Supp. 299, 306 (D.P.R. 1992) (citing *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973)). Here, the Complaint does not identify either the language at issue or the plaintiff's country of national origin, and without more information, she has failed to sufficiently establish that her language was a mere proxy for the manager's alleged discrimination based on her nationality. *See Gebretsadike v. Dist. of Columbia*, No. 23-03198 (RCL), 2024 WL 3291744, at *6 (D.D.C. Jul. 3, 2024) ("The Court is left with no basis to find that the Amended Complaint alleges comments that were true "slurs" or that truly related to his national origin.").

Indeed, the plaintiff has not pleaded enough to establish that the manager was even aware of her national origin. She alleges only that the manager was, presumably, aware that she spoke a foreign language, but the plaintiff's allegation is nothing more than speculation, and moreover, "[m]ere evidence of foreign language proficiency or a foreign language background, without anything more," does not infer discrimination based on national origin. *See Vazirabadi v. Denver Health and Hospital Authority*, No. 17-cv-01737, 2018 WL 8963447, at *8 (D. Colo. Oct. 11, 2018), *aff'd*, 782 Fed. Appx. 681 (10th Cir. 2019), *cert. denied*, 589 U.S. 1294 (2020); *see Pemberthy v. Beyer*, 19 F.3d 857, 870 (3d Cir. 1994) ("we are not willing to hold as a matter of law that language-based classifications are always a proxy for race or ethnicity and receive strict scrutiny for that reason; nor are we willing to hold that language-based classifications receive strict or heightened scrutiny for any other reason.), *cert. denied*, 513 U.S. 969 (1994); *see also Orellana-Escobar v. Fernandez*, No. 24-1767 (RDM), 2026 WL 161189, at *6 (D.D.C. Jan. 21, 2026) (dismissing equal protection claims where the plaintiff alleged that the defendant bore "invidious discriminatory animus[,]" against Salvadorans, but merely "suggest[ed], at most," that the defendant, also a Spanish speaker, "might have been aware of his Salvadoran national origin" because the plaintiff "was speaking a dialect of Dominican Spanish[.]").

Furthermore, although the plaintiff alleges that the manager quarreled with her and proposed that she leave, she does not contend that the manager was ultimately responsible for her expulsion from the Library; it was, rather, the Director of Security and Emergency Preparedness who was the actual decisionmaker. *See Ahmed v. Kable*, No. 21-3333 (TJK), 2023 WL 6215024, at *9 (D.D.C. Sept. 25, 2023) (dismissing equal protection claims where the plaintiff alleged that certain individuals made "comments suggesting racial, ethnic, and religious animus," but were not the decisionmakers who placed him on the Terrorist Screening Dataset). To the contrary, the

plaintiff asserts that she doubted that the manager was, in fact, who she said she was, or that she was even employed at the Library. *See* Compl. at 8; *see also Sparrow v. United Airlines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000) ("In some cases, it is possible for a plaintiff to plead too much: that is, to plead himself out of court by alleging facts that render success on the merits impossible.").

While the plaintiff is not obligated to prove a *prima facie* case at this stage of the case, her bare assertions are "not entitled to be assumed true," *Iqbal*, 556 U.S. at 682, and she has simply failed to plead facts that are more than "merely consistent with" the defendant's liability, as required, *see id*. at 678 (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 557). In other words, because the plaintiff has failed to allege plausible—as opposed to possible—discriminatory animus by the defendant, her claims must be dismissed. *See Atherton*, 567 F.3d at 687–88 (affirming dismissal of the plaintiff's equal protection claim based on *ipse dixit* and "spare facts and allegations[,]" including his broad assertion that individuals "reacted negatively to his Hispanic ethnicity."); *see also Jackson v. Office of Mayor of Dist. of Columbia*, No. 19-7148, 2020 WL 2554609, at *1 (D.C. Cir. May 14, 2020) (affirming dismissal of equal protection claim that merely "appeared" to the plaintiff to be a discriminatory act) (per curiam), *cert. denied*, 141 S.Ct. 1509 (2021).

For the reasons stated above, the Court finds that the plaintiff has failed to establish that the defendant has waived sovereign immunity for any intended APA claim, and she has failed to sufficiently allege a violation of her constitutional rights or otherwise sufficiently allege any discrimination claim.

## IV. CONCLUSION

Accordingly, the Court grants the defendant's Motion to Dismiss, ECF No. 25, and it dismisses the Complaint and this action. A final, appealable Order accompanies this Memorandum Opinion.

**SO ORDERED** this 3rd day of September, 2026.

REGGIE B. WALTON
*United States District Judge*